IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stephen J. Smith,                       :
                  Petitioner      :
                                   :
           v.                   :
                                   :
State Civil Service Commission     :
(State Correctional Institution       :
at Pine Grove, Department of       :
Corrections),                      :   No. 1504 C.D. 2015
                  Respondent   :   Submitted: April 8, 2016


BEFORE:   HONORABLE ROBERT SIMPSON, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                         FILED: July 28, 2016


          Stephen J. Smith (Smith) petitions this Court for review of the State Civil Service Commission's (Commission) July 24, 2015 Adjudication and Order dismissing his appeal challenging his three-day suspension from regular Corrections Officer 1 (CO-1) employment with the Department of Corrections (DOC), State Correctional Institution at Pine Grove (SCI-Pine Grove). Smith presents three issues for this Court's review: (1) whether SCI-Pine Grove violated Management Directive 580.11 by not properly signing Smith's suspension letter; (2) whether SCI-Pine Grove violated administrative procedure by not timely providing its witness list to Smith; and, (3) whether SCI-Pine Grove violated Section 2.4.1 of the Computer Forensic Investigations (CFI) Procedural Manual. After review, we affirm.

          Smith has been employed as a CO-1 for 18 years. He transferred to SCI-Pine Grove in June 2013. By March 18, 1997 signature, Smith affirmed that he

received, read and agreed to abide by DOC's Code of Ethics Handbook. In addition, SCI-Pine Grove employees receive annual information technology computer-based training, which offers a link to DOC Policy 2.3.1, Information Technology. Brian O'Donnell (O'Donnell) has been employed as SCI-Pine Grove's Intelligence-Gathering Captain for seven years, and is responsible for security. O'Donnell attended meetings with SCI-Pine Grove Superintendent Eric P. Bush (Superintendent Bush), wherein various department heads presented unauthorized documents that printed from their printers which included, *inter alia,* caricatures of Sergeant Thomas Lindsay (Lindsay) and the words: "**YOU MADE A DIFFERENCE TODAY**[;]" "**THERE IS A SNAKE IN THE GRASS**[;]" and "**YOU ARE NOT ONLY PART OF A TEAM OF ELITE PROFESSIONALS** . . . ." Certified Record (C.R.) Vol. 2, Ex. AA-19-20. Superintendent Bush asked O'Donnell to investigate the unauthorized documents. O'Donnell asked SCI-Pine Grove IT Generalist 1 Brian Hoffman (Hoffman) to find out who printed the subject pages. O'Donnell notified Hoffman which printers printed the pages, the print dates and estimated print times.

Each SCI-Pine Grove employee is assigned to one of two print servers. When the employee selects the print command on his/her computer, the print request is sent to his/her assigned print server, which forwards the request to the printer selected by the employee. The employee is able to print from any SCI-Pine Grove printer. The two print servers track all SCI-Pine Grove print jobs. Hoffman is able to access an event viewer on each print server to determine all of the print jobs that the print server processed. By doing so in this case, Hoffman discovered that Smith had printed items to multiple SCI-Pine Grove printers over a short period of time. Based upon the dates and times O'Donnell supplied, Hoffman was able to determine with Smith's username what computer Smith was logged onto, and the dates and times of his print jobs. The print jobs were sent during Smith's shift to seven or eight

2

different SCI-Pine Grove printers within one minute. Because there were not many print jobs sent during Smith's shift, Hoffman found this activity unusual.

When Hoffman narrowed his search to any print jobs linked to Smith's username, he discovered that, on multiple days, numerous print jobs were sent to printers/copiers throughout SCI-Pine Grove in a short amount of time. An SCI-Pine Grove shift schedule reflects that Smith worked a shift beginning at 10:00 p.m. on May 20, 2014 and ending at 6:00 a.m. on May 21, 2014. A May 21, 2014 event properties record demonstrates that a document prepared under Smith's username was printed on the SCI-Pine Grove A Unit Copier, B Unit Copier, D Unit Copier, H Unit Copier, Business Office Colored Printer, Clerks Program Services, Maintenance Copier, and Medical Copier from 2:54 a.m. to 2:55 a.m.; on the A Unit Copier, B Unit Copier, D Unit Copier, H Unit Copier, Clerks Program Services, Maintenance Copier, and Medical Copier from 3:11 a.m. to 3:12 a.m.; on the A Unit Copier, B Unit Copier, D Unit Copier, H Unit Copier, Clerks Program Services, Maintenance Copier, and Medical Copier from 4:53 a.m. to 4:54 a.m.; and two documents were printed on the C Unit Copier at 6:51 a.m.

An SCI-Pine Grove shift schedule shows that Smith worked from 10:00 p.m. on May 21, 2014 until 6:00 a.m. on May 22, 2014. A May 22, 2014 event properties record demonstrates that a document drafted under Smith's username was printed on the C Unit Copier, Clerks Program Services, and Maintenance Copier from 5:28 a.m. to 5:29 a.m.

A shift schedule shows that Smith worked from 10:00 p.m. on May 29, 2014 until 6:00 a.m. on May 30, 2014. A May 30, 2014 event properties record reflects that a document created under Smith's username was printed on the A Unit Copier, B Unit Copier, C Unit Copier, D Unit Copier, H Unit Copier, Program Services Copier, Clerks Program Services, and Medical Copier from 1:12 a.m. to 1:13 a.m. An SCI-Pine Grove shift schedule shows that Smith worked from 10:00

3

p.m. on May 31, 2014 until 6:00 a.m. on June 1, 2014. A June 1, 2014 event properties record indicates that documents prepared under Smith's username were printed on the C Unit Copier at 12:08 a.m. and 12:19 a.m., respectively, and on the H Unit Copier and A Unit Copier from 2:09 a.m. to 2:18 a.m., respectively. Hoffman also investigated Smith's computer profile and discovered that it included a computer game called Bubble Shooter, a video holiday card, several icons/cartoons of nurses, and photographs of SCI-Pittsburgh's interior.

On June 6, 2014, O'Donnell interviewed Smith about Hoffman's findings and showed him the items in his computer profile. Smith acknowledged that he had seen them before. O'Donnell also showed Smith some of the printed documents, which included Lindsay's caricatures and the words: "**YOU MADE A DIFFERENCE TODAY**[;]" "**THERE IS A SNAKE IN THE GRASS**[;]" and "**YOU ARE NOT ONLY PART OF A TEAM OF ELITE PROFESSIONALS** . . . ." C.R. Vol. 2, Ex. AA-19-20. Smith denied that he printed the caricatures, but admitted that he printed the other pages. At the end of the interview, O'Donnell asked Smith to submit a written statement.

By June 18, 2014 memorandum, SCI-Pine Grove notified Smith that a pre-disciplinary conference (PDC) was scheduled for June 23, 2014 to afford him the opportunity to respond to charges that he violated DOC's Code of Ethics Sections B.10 and B.29, and DOC Policy 2.3.1, Sections 2.C.4.e and 2.D.8. Specifically, SCI-Pine Grove charged that Smith sent unauthorized materials to several dozen printers/copiers throughout the institution, and that there were games, icons/cartoons of nurses/nursing, and photos of an SCI-Pittsburgh cell block on his Commonwealth computer account. By June 18, 2014 signature, Smith confirmed that he received a copy of the PDC notice.

On June 22, 2014, SCI-Pine Grove conducted Smith's PDC, but neither Smith nor a union representative attended. SCI-Pine Grove's Field Human Resource

Officer Barbara Wagner (Wagner), Deputy Superintendent Marshall Shirley (Shirley), and Major of the Guard Billie Heide (Heide) comprised the PDC panel. Lieutenant Daniel Martynuska presented SCI-Pine Grove's charges and evidence. Ultimately, the PDC panel found that Smith violated DOC's Code of Ethics Section B.10 and DOC Policy 2.3.1, Sections 2.C.4.e and 2.D.8, but not DOC's Code of Ethics Section B.29. Wagner submitted the PDC findings to Superintendent Bush, and based thereon he decided to discipline Smith.

SCI-Pine Grove submitted the PDC findings to DOC's Central Office, which returned a recommended range of sanctions, from which Superintendent Bush chose a three-day suspension. Because Superintendent Bush was on vacation at that time, SCI-Pine Grove Deputy Superintendent Jamie M. Boyles (Deputy Superintendent Boyles) signed the September 5, 2014 letter notifying Smith of his three-day suspension. Wagner's usual practice was to place a disciplinary letter in an envelope and provide it to the employee's supervisor to give to the employee. However, because Wagner did not work the 10:00 p.m. to 6:00 a.m. shift with Smith or his supervisor, she emailed the suspension letter to the commissioned officers on Smith's shift, and put the letter in a sealed envelope marked "confidential" and placed the sealed envelope on a clipboard in SCI-Pine Grove's control center. On September 5, 2014, Lieutenant Kevin Mohring (Mohring) received a copy of the suspension letter by e-mail, retrieved the sealed envelope from the clipboard, gave it to Smith and told him that it contained a suspension letter. Mohring asked Smith to sign a receipt for the letter, but Smith refused.

Smith appealed from his suspension to the Commission, and a hearing was held on March 13, 2015. At the hearing, Smith argued that SCI-Pine Grove's act of suspending him was discriminatory under Section 905.1 of the Civil Service Act

(Act),[1] 71 P.S. § 741.905a, as retaliation for his filing a complaint with the DOC Office of Equal Employment Opportunity. Smith also argued technical discrimination based on SCI-Pine Grove's failure to comply with its management directives. On July 24, 2015, the Commission denied Smith's appeal and affirmed his suspension. Smith appealed to this Court.[2]

Initially,

> [t]echnical discrimination involves a violation of procedures required pursuant to the [Act] or related regulations. In order to obtain relief, an employee must show that he was, in fact, harmed because of the technical non-compliance with the Act or evidence that because of the peculiar nature of the procedural impropriety he could have been harmed but there is no way to prove that for certain.

*Perry v. State Civil Serv. Comm'n (Dep't of Labor & Indus.)*, 38 A.3d 942, 956 (Pa. Cmwlth. 2011) (citation omitted).

Smith first argues that SCI-Pine Grove violated Management Directive 580.11 by not properly signing Smith's suspension letter. Specifically, Smith asserts that Deputy Superintendent Boyles signed on behalf of Superintendent Bush without having the properly delegated signatory authority to do so. We disagree.

---

[1] Act of August 5, 1941, P.L. 752, *as amended*, 71 P.S. §§ 741.1– 741.1005. Section 905.1 of the Act provides that '[n]o officer or employe of the Commonwealth shall discriminate against any person in . . . promotion . . . or any other personnel action with respect to the classified service because of political or religious opinions or affiliations[,] because of labor union affiliations or because of race, national origin or other non-merit factors.' 71 P.S. § 741.905a.

*Price v. Luzerne/Wyoming Cntys. Area Agency on Aging,* 672 A.2d 409, 411 n.3 (Pa. Cmwlth. 1996). Section 905.1 of the Act was added by Section 25 of the Act of August 27, 1963, P.L. 1257.

[2] "The Court's review of a decision of the Commission is limited to determining whether constitutional rights have been violated, [whether] errors of law have been committed or whether its findings are supported by substantial evidence." *Walsh v. State Civil Serv. Comm'n (Dep't of Transp.)*, 959 A.2d 485, 488 n.2 (Pa. Cmwlth. 2008).

6

Section 105.4 of the Commission's Regulations states, in pertinent part:

> Personnel action notices shall be personally signed by the agency head, or a designated subordinate. If this responsibility has been delegated within the appointing authority, the delegation shall be submitted in writing to the Director and identify the designees by specific work title. Subordinates properly delegated signatory authority by the appointing authority may not further delegate the authority.

4 Pa. Code § 105.4. Further, Management Directive 580.11 provides, in relevant part:

> d. Each agency shall provide the Director, [Commission], with a copy of the written delegation of signatory authority for the actions identified in Enclosure 1[.] Form SCSC-5280, *Delegation of Signatory Authority*, is to be used when an agency delegates signatory authority in accordance with this directive (see Enclosure 3). . . .

C.R. Vol. 2, Ex. AP-3 at 2. By July 10, 2014 Form SCSC-5280, the "Deputy Corrections Superintendent" is expressly delegated signatory authority for the "Corrections Superintendent," for "ALL" notices and/or documents. C.R. Vol. 2, Ex. AA-7.

Accordingly, since Deputy Superintendent Boyles had the properly-delegated signatory authority to sign Smith's suspension letter on Superintendent Bush's behalf, SCI-Pine Grove did not violate Management Directive 580.11.[3]

---

[3] This Court notes:

> [W]hile Section 105.4 of the Commission's [R]egulations . . . requires that delegations of signatory authority be submitted in writing to the Commission, **noncompliance is not grounds for automatic nullification of the personnel action**. *See, e.g., Bosnjak* [*v. State Civil Serv. Comm'n,* 781 A.2d 1280 (Pa. Cmwlth. 2001)] (**failure to adhere to notice requirements in Section 105.3 of the Commission's [R]egulations, 4 Pa. Code § 105.3, does not automatically nullify personnel action**); . . . *Dep't of Corr. v. Adamson,* . . . 567 A.2d 763 ([Pa. Cmwlth.] 1989) (**failure to adhere to notice requirements in Section 105.1 of the Commission's**

7

Smith next contends that SCI-Pine Grove violated administrative procedure when it did not provide the witness list to Smith until after the hearing concluded. We disagree.

Section 105.14b(c) of the Commission's Regulations provides:

> *Witness list.* Each party shall attempt to determine the witnesses they intend [sic] to call at the hearing and the names **shall be provided to the Commission no later than 3 work days in advance of the hearing**, with a copy to the opposing party. Calling a witness whose name does not appear on the list may be permitted at the discretion of the Commission.

4 Pa. Code § 105.14b(c) (emphasis added). When Smith raised this issue at the hearing, the following exchange occurred:

> ATTORNEY KUNKEL [DOC's Counsel]:
>
> Actually, Your Honor, in response, the Commission's [R]egulation at 105.14 --- actually, just a second. Yes. 105.14B --- Sub B, Sub C state[s] that the names shall be provided to the Commission no later than three workdays in advance of the hearing with a copy to the opposing party. I have a record here that **we did file a witness list with the Commission dated March the 10th, 2015, and it was served via facsimile**.
>
> And if you'll notice, Your Honor, **on the second page, there is a CC to [] Smith, and it says via regular U.S.**

---

> [**R**]**egulations, 4 Pa. Code § 105.1, does not automatically nullify personnel action**). In short, **Section 105.4 [of the Commission's Regulations] does not nullify the principle that harm must be shown**. Indeed, the [R]egulation does not state otherwise.[FN7]
>
> > [FN]7 Of further note, although [the employee] claims that [] failure to delegate signatory authority in writing to the Commission constitutes a violation of a management directive, this Court holds that a management directive is not an administrative regulation with the force and effect of law.

*Perry,* 38 A.3d at 956 (emphasis added).

**mail**.  Now, [] Smith has not provided myself [sic] with a personal e-mail address[4] or a facsimile number to get anything to him faster, based upon correspondence both in this case and in a previous case that was held before this Commission in the fall.  So the only manner in which I could transmit anything to [] Smith is via the U.S. mail.

And I can tell you that it was mailed.  And it was given, rather, to my secretary to mail out on the date that it was sent.  And the [R]egulation only requires that we file it with the Commission three days in advance with a copy to the other side.  **The Commission's [R]egulations does --- do not mandate that [Smith] receive a copy three days in advance**.

COMMISSIONER RAINEY:

Okay.  Your matter is noted there.  Your question is a good one.  **It does appear that the date that we received it, you were [sic] mailed it**.  Now, if you haven't received it today, probably, you have one of those checks in the mail.

C.R. Vol. 1, Tab 1 at 17-18 (emphasis added).  Accordingly, because the witness list was faxed to the Commission three days prior to the hearing and concurrently mailed to Smith, SCI-Pine Grove did not violate Section 105.14b(c) of the Commission's Regulations.

Lastly, Smith argues that SCI-Pine Grove violated Section 2.4.1 of the CFI Procedural Manual because it did not have proper authority to confiscate his computer files, and SCI-Pine Grove did not follow the proper chain of custody.  We disagree.

This Court acknowledges that Section 2.4.1 of the CFI Policy Statement expressly states:

---

[4] Smith responded: "For the record, [he] [did] have a departmental e-mail."  C.R. Vol. 1, Tab 1 at 18.  However, Attorney Kunkel rejoined that they only use personal e-mail because "during business hours, [he] [is] not certain whether it's directly work related or not." *Id.*

9

## VI. RIGHTS UNDER THIS POLICY

**This policy does not create rights in any person** nor should it be interpreted or applied in a manner as to abridge the rights of any individual. **This policy should be interpreted to have sufficient flexibility** to be consistent with law and to permit the accomplishment of the purpose(s) of the policies of [DOC].

C.R. Vol. 2, Ex. AP-19 (text emphasis added).

Notwithstanding, O'Donnell testified during cross-examination:

Q. [Smith]   I wanted to know if 1-1 A, investigation authorization request --- if it was followed. Was a request made to the Secretary, the Executive Deputy Secretary or the Regional Deputy Secretary to give you authorization to search my computer, as is required under the policy?

A. [O'Donnell]   Actually, it was given to me by his designee, Superintendent Bush.

C.R. Vol. 1, Notes of Testimony, March 13, 2015 (N.T.) at 205-206. He further related:

Q. [] O'Donnell, did you state you were aware of this investigation policy [Ex. AP-19/Section 2.4.1. of the CFI Procedural Manual]?

A. Yeah.

Q. Yes?

A. Uh-huh (yes).

Q. Did you follow it when you investigated me?

A. Yes, sir.

Q. Did you follow proper chain of custody?

A. Yes, sir, I did.

. . . .

Q. Did you use the identification of marking of evidence, sir? Did you mark each item carefully, ensure that it was

confiscated or collected, each item, in the proper way to later be used in [the] court of law?

A.  Absolutely.

C.R. Vol. 1, N.T. at 216-218.  As O'Donnell's cross-examination was the only time Smith raised this issue, and O'Donnell confirmed that Section 2.4.1. of the CFI Procedural Manual was followed, Smith cannot prevail on this claim.

For all of the above reasons, the Commission's Adjudication and Order is affirmed.

_____
ANNE E. COVEY, Judge

11

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stephen J. Smith, : 
                Petitioner : 
                                     : 
               v. : 
                                       : 
State Civil Service Commission : 
(State Correctional Institution : 
at Pine Grove, Department of : 
Corrections), :     No. 1504 C.D. 2015 
                Respondent : 

## O R D E R

AND NOW, this 28th day of July, 2016, the State Civil Service Commission's July 24, 2015 Adjudication and Order is affirmed.


_____
ANNE E. COVEY, Judge